IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| EL PASO WATER UTILITIES – PUBLIC SERVICE BOARD, for and on behalf of the City of El Paso, Texas, a Texas municipal corporation, § § § § § | |
| v. § | EP-22-CV-460-DB |
| § | |
| JAMES C. KENNEY, in his official capacity as Cabinet Secretary of the NEW MEXICO ENVIRONMENT DEPARTMENT; JOHN RHODERICK, in his official capacity as Water Protection Division Acting Director of the NEW MEXICO ENVIRONMENT DEPARTMENT. § § § § § § § § | |

## MEMORANDUM OPINION AND ORDER ON DEFENDANTS' 12(B)(2) MOTION TO DISMISS

On this day, the Court considered Defendant James C. Kenney, in his official capacity as Cabinet Secretary of the New Mexico Environment Department and John Rhoderick, in his official capacity as Water Protection Division Director of the New Mexico Environment Department's (collectively, "NMED") Motion to Dismiss for Lack of Personal Jurisdiction ("Motion"). ECF No. 18. Plaintiff El Paso Water Utilities – Public Service Board ("EP Water"), for and on Behalf of the City of El Paso, Texas filed a timely response, and NMED filed a timely reply. ECF Nos. 28 and 33.

## BACKGROUND

In August 2021, record rainfall near the border of Texas and New Mexico ruptured a sewer pipeline, triggering EP Water to divert sewage into the Rio Grande to protect the health and safety of the local community. Plaintiff's First Amended Complaint[1] ("Compl.") ¶ 32, 34–35,

---

1 Importantly, at the motion to dismiss phase, a plaintiff's allegations must be taken as true. *Wien Air Alaska, Inc. v.*

ECF No. 14; Danielle Prokop, 2021 was a tumultuous year for El Paso's climate and environment, El Paso Matters, December 30, 2021; https://www.weather.gov/epz/elpaso_monthly_precip. This case concerns the debate over which states were affected by the diversion and which laws should guide the mitigation and clean-up efforts. The discharge point where the sewage was released was in El Paso, Texas. Compl. ¶ 34, ECF No. 14. Downstream of the discharge point, portions of the river are in both Texas and New Mexico. *Id.* at ¶ 39.

EP Water avers that it took mitigation measures immediately after the pipeline break and communicated those efforts to NMED. *Id.* at ¶ 40, 41, 45. Those mitigation efforts included an eight-hour tour of the area impacted by the break of the sewage lines, which NMED representatives were invited to. Response 5, ECF No. 28; Itinerary: El Paso Water Frontera Force Main (FFM) Breaks and Mitigation Sites Tour, ECF No. 28-1.

EP Water also argues that "the Clean Water Act controls in matters involving alleged interstate water pollution and, pursuant to the Supremacy Clause of the U.S. Constitution, preempts the application of the state environmental laws of alleged "downstream" or "affected" states. Resp. 4, ECF No 28. NMED argues that the diversion of the untreated sewage violated New Mexico regulations. Mot. 8, ECF No. 18; *Administrative Compliance Order*, Ex. 1, ECF No. 1-2 at pg. 2 ¶ 7.

## I. NMED's environmental regulation enforcement efforts

Almost a year after the incident, NMED issued two Administrative Compliance Orders, asserting that EP Water had violated New Mexico water quality regulations. Compl. ¶ 64, ECF No. 14; *Administrative Compliance Orders*, Ex. 1, ECF No. 1-2; Ex. 2, ECF No. 1-3. These orders impose a fine of over one million dollars on EP Water. Compl. at ¶ 66. They direct EP

---

*Brandt*, 195 F.3d 208, 211 (5th Cir. 1999) ("Where facts are disputed, the plaintiff presenting a prima facie case is entitled to have the conflicts resolved in his favor.")

2

Water to "limit public access to the work area in the Texas riverbed," to "conduct water quality monitoring and testing on a monthly basis at two locations in Texas and provide quarterly reports to New Mexico." Resp 6, ECF No. 28. The Orders also direct EP Water to engage in mitigation and restoration activities including "erosion control" and "re-planting of native vegetation" "on and adjacent to the Rio Grande," without specifying whether those areas are in Texas or New Mexico. *Administrative Compliance Order*, Ex. 1 ¶ 38. ECF No. 1–2.

If enforced, EP Water alleges that the Compliance Orders would impose New Mexico water quality regulations beyond the border of New Mexico and into Texas. Compl. ¶ 71, ECF No. 14. NMED, for its part, argues that the civil penalties that it issued are "for violations that occurred exclusively in New Mexico," the most serious of which "are related to a failure to properly report an unpermitted discharge that crossed the border into New Mexico." Mot 4, ECF No. 18. After NMED issued the compliance orders, EP Water filed this lawsuit, claiming that NMED "had invaded EP Water's federal rights in violation of the Supremacy Clause and Dormant Commerce Clause of the United States Constitution by seeking to apply and enforce New Mexico state environmental regulations in Texas." Compl. ¶¶ 78-131, ECF No. 14.

This opinion does not set out to resolve the merits of this case. NMED argues that this court cannot reach that question because it lacks personal jurisdiction. Mot., ECF No. 18. EP Water argues that this Texas court can bind NMED to a judgment because the agency has established sufficient minimum contacts with Texas through its enforcement activities—namely the administrative compliance orders and the enforcement actions surrounding them. Resp., ECF No. 28. The issue then is whether, through its enforcement actions, NMED has established sufficient minimum contacts for this Texas district court to exercise specific personal jurisdiction over it. The Court concludes that it has.

## LEGAL STANDARD

Personal jurisdiction refers to a court's authority to render a judgment against a defendant. *International Shoe Co. v. Washington*, 326 U.S 310, 316 (1945). "[A] state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum State." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980) (citing *Id.*). "The concept of minimum contacts . . . can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *Id.* at 291–92.

To evaluate minimum contacts, courts ask whether (1) the defendant "purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there;" whether (2) the case "arises out of or results from the defendant's forum-related contacts;" and whether (3) "the exercise of personal jurisdiction is fair and reasonable." *Bulkley & Assoc., L.L.C. v. Dep't of Indus. Rel., Div. of Occupational Safety and Health of the State of CA,* 1 F.4th 346, 351 (5th Cir. 2021). "[W]hether the minimum contacts are sufficient to justify subjection of the non-resident to suit in the forum is determined not on a mechanical and quantitative test, but rather under the particular facts upon the quality and nature of the activity with relation to the forum state." *Miss. Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1006 (5th Cir. 1982).

## ANALYSIS

The briefs from both sides focus on four Fifth Circuit cases—*Bulkley, Wercinski, Antt,* and *Grewal*—which represent the Fifth Circuit's analysis of whether an out-of-state

4

administrative agency's enforcement actions can establish sufficient minimum contacts for Texas to exercise personal jurisdiction. 1 F.4th 346; 513 F.3d 476 (5th Cir. 2008); 528 F.3d 382 (5th Cir. 2008); 971 F.3d 485 (5th Cir. 2020). In three of those cases, the Fifth Circuit found that Texas could not exercise specific personal jurisdiction over the Defendants. *Bulkley*, 1 F.4th 346; *Wercinski*, 513 F.3d 476; *Antt*, 528 F.3d 382. In one of those cases, the Fifth Circuit found that Texas could exercise specific personal jurisdiction over the Defendant. *Grewal*, 971 F.3d 485. This Court believes that this case is more analogous to the *latter* situation.

### I. In *Bulkley, Antt*, and *Wercinksi* the Fifth Circuit Held That The Court Lacked Personal Jurisdiction.

In *Antt, Wercinski*, and *Bulkley*, an out-of-state entity initiated a regulatory action against a Texas-based business, the Texas-based business brought suit in Texas court, and the defendants moved to dismiss for lack of personal jurisdiction. Both *Antt* and *Wercinscki* involved Commissioners of the Arizona and Florida State Departments of Real Estate, respectively, sending a cease-and-desist letter to a Texas-based broker and advertiser of timeshares for allegedly violating their states' real estate laws. *Wercinski*, 513 F.3d at 480; *Antt*, 528 F.3d at 386. The Texas-based broker then sued the Commissioners. 528 F.3d at 383–85; 513 F.3d at 480–81. *Bulkley* involved a Texas-based trucking company suing a California agency because the agency imposed sanctions on the trucking company after a worker was injured in California. 1 F.4th at 348–50. In all three cases, the Fifth Circuit dismissed for lack of personal jurisdiction. *Bulkley*, 1 F.4th at 355; *Wercinski*, 513 F.3d at 489; *Antt*, 528 F.3d at 387.

In each case, the out-of-state agency sent a cease-and-desist letter to the Texas business. *Bulkley*, 1 F.4th 352; *Wercinski*, 513 F.3d at 480; *Antt*, 528 F.3d at 386. The Texas businesses argued that this single enforcement action made up sufficient minimum contacts for the Texas court to establish personal jurisdiction. The Fifth Circuit disagreed. It found that the letters

alone fell short. *Bulkley,* 1 F.4th at 353; *Wercinski,* 513 F.3d at 485-86; *Antt,* 528 F.3d at 386.

In *Bulkley*, the plaintiff argued that the California agency's contacts exceeded the cease-and-desist letter because in that letter the agency referenced "the possibility of past and future inspections in Texas," that is other potential jurisdictional contacts. 1 F.4th at 352. However, the Fifth Circuit dismissed Bulkley's argument, holding that "minimum contacts must be 'known' and not 'hypothetical.'" 1 F.4th at 353 (quoting *Wercinski,* 513 F.3d 484).

Further, *Bulkley* held that the plaintiff had not established minimum contacts because the "scope of the letter [was] limited to California-related conduct." *Bulkley*, 1 F.4th 354. The court reached this conclusion because "the letter references only violations of California law related to a specific 2015 accident in Salinas, California," and "the laws that the letter instructed Bulkley to follow are themselves limited to persons and events within California." *Id.*

Because (1) cease-and-desist letters alone are insufficient to establish minimum contacts; (2) contacts must be "known" and not "hypothetical"; and (3) agency actions do not establish personal jurisdiction when they are "cabined" to regulating activity within their own states, the court dismissed all three cases for lack of personal jurisdiction. *Bulkley,* 1 F.4th at 355; *Wercinski*, 513 F.3d at 489; *Antt,* 528 F.3d at 387.

## II. In *Grewal* the Fifth Circuit Held That the Court Had Personal Jurisdiction.

Like *Bulkley*, *Antt*, and *Wercinski*, *Grewal* concerned an out-of-state agency seeking to regulate a Texas business's activities. Plaintiff Defense Distributed, a Texas-based business, "operated for the purpose of promoting popular access to firearms." *Def. Distributed v. Grewal,* 971 F.3d 485, 488 (5th Cir. 2020). In December 2012, Defense Distributed began distributing files related to the 3D printing of firearms " via its websites and via mail. *Id.* "Shortly thereafter, nine Attorneys General, including New Jersey Attorney General Grewal,

6

filed suit on behalf of their respective states in the Western District of Washington to enjoin . . . Defense Distributed [from publishing its files.]." *Id.* at 488–89. Before suing in Washington, Attorney General Grewal took "select enforcement actions," including "sending a cease-and-desist letter threatening legal action if Defense Distributed published its files." *Id.*

Like the previous cases, "the totality of [Attorney General Grewal's] contacts with Texas involves a cease and desist order [ ]." *Id.* at 491. (internal citations omitted). However, the Fifth Circuit found that Attorney General Grewal's contacts were "distinguishable in at least two key respects" from *Wercinski. Id.* at 492. First, unlike *Wercinski,* where the plaintiff's claim was "more a product of Arizona's regulatory scheme than it was the cease-and-desist letter itself," in *Grewal* the court found that many of the plaintiff's claims were "based on injuries stemming solely and directly from [Attorney General] Grewal's cease-and-desist letter." *Id.*

Second, and "more important" the court distinguished *Grewal* from the other cases because Attorney General Grewal did not "cabin his request" to protecting New Jersey and its constituents. *Id.* In *Wercinski,* the Court did not find minimum contacts because the Arizona commissioner "was simply 'asserting nationwide authority over any real estate transactions involving Arizona residents or property." *Id.* (citing *Wercinski,* 513 F.3d at 486). By contrast, Attorney General Grewal "d[id] not cabin his request by commanding the plaintiffs to stop publishing materials to New Jersey residents; he instead demand[ed] that the plaintiffs cease publication of their materials generally." *Id.*

Because the court found that *Wercinski* was "distinguishable, and thus not dispositive," the court proceeded to evaluate whether Attorney General Grewal had established minimum contacts under *Calder*'s "effects test." *See Calder v. Jones*, 465 U.S. 783 (1984). Under this test, jurisdiction is proper when a party's intentional conduct outside the forum state is

7

calculated to cause injury within that state. *Id.* at 791. The Fifth Circuit found that Attorney General Grewal had intentional contact with Texas by mailing the cease-and-desist letter. *Grewal,* 971 F.3d at 495 (citing *Walden v. Fiore,* 571 U.S. 277, 285 (2014) ("[P[hysical entry into the State—either by the defendant in person or through an agent, goods, *mail,* or some other means—is certainly relevant conduct." (emphasis added)). The court further found that " [Attorney General] Grewal knew that the cease-and-desist letter would 'have a potentially devastating impact' on the plaintiffs' activities, including Texas residents." *Id.* (citing *Calder* 465 U.S. at 789). And he "knew that the brunt of [the] injury would be felt by [the plaintiffs] in [Texas]." *Grewal,* 971 F.3d at 495, (citing *Calder* 465 U.S. at 789–90). The Fifth Circuit thus found that jurisdiction over Grewal was proper. *Id.* at 497.

### III. NMED Has Even More Enforcement-Related Contacts Than *Grewal* and They Are Not Cabined to New Mexico.

The Court now examines the arguments in this case and the precise contacts that El Paso Water alleges NMED made with Texas through its enforcement actions. In Part c of this Section, the Court examines whether the *Calder* effects test applies. While the Court ultimately finds that it does not, it finds that the number of contacts NMED had with Texas and the broad, uncabined legal authority it wishes to exercise makes jurisdiction proper in this case through the traditional minimum contacts test for specific jurisdiction.

#### a. Activities that NMED directed towards Texas.

EP Water alleges that "any possible effects from the discharge on the state of New Mexico were limited geographically because, downstream of the Keystone discharge site there are only a few portions of the Rio Grande that are located in New Mexico. . ." Compl. ¶ 39, ECF No. 1.

NMED responds that the discharge did cross the border into New Mexico. Mot. 4, ECF No 18. This prompted it to issue two Administrative Compliance Orders, asserting that EP Water had violated New Mexico environmental regulations. *Id.*; Compl. ¶ 64, ECF No. 1. NMED argues that the Compliance Order that it issued "only references violations of New Mexico regulations related to events that happened within the border of New Mexico. These regulations are . . . limited to events occurring within NMED's jurisdiction. NMED is not attempting to regulate any activity that does not directly impact New Mexico residents or property." Mot. 8, ECF No 18.

EP Water, however, argues that the following actions by NMED make up "extensive, purposeful contacts with the state of Texas:"

1. conducting an extensive ten-month investigation directed at the discharge site of wastewater in El Paso, Texas;

2. directing written communication to EP Water in El Paso to solicit information regarding the size and location of the discharge in El Paso and the status and progress of EP Water's remediation and restoration work in the Rio Grande riverbed in Texas;

3. sending its personnel to El Paso to conduct an eight hour, in-person site inspection of seven different discharge sites in Texas;

4. mailing and emailing a Notice of Noncompliance to EP Water in El Paso;

5. mailing and emailing two Administrative Compliance Orders to EP Water in El Paso.

Resp. 5, ECF No. 28.

9

EP Water emphasizes that "NMED's Orders do not limit or 'cabin' their application to events in New Mexico and apply directly to locations and events in Texas." Resp. 7, ECF No 28 (citing *Grewal*, 971 F.3d at 492). Further, the orders "are final orders that issue monetary penalties of $1,284,375 against a public utility funded by Texas ratepayers." *Id.* at 14.

EP Water argues that its case is distinguishable from *Bulkley*. Resp. 18–21, ECF No. 28. In *Bulkley*, the Court pointed out the obvious: the letter referenced violations of California law related to a specific accident in California. 1 F.4th at 354. Second, the California laws that the letter instructed Bulkley to follow are themselves limited to persons and events within California. *Id.* at 354–55. Here—EP Water argues—"NMED's physical entry into the State of Texas for the purpose of inspecting EP Water in furtherance of its administrative enforcement is . . . an undisputed fact." Resp. 20, ECF No. 28. Further, EP Water points out that here, "NMED's administrative action is not directed at, or limited to, any business transacted by EP Water in the State of New Mexico. Rather, NMED's administrative compliance orders arise from, and seek to extra-territorially impose New Mexico state law on, the conduct of EP Water's Texas governmental functions in Texas." *Id.* at 20–21.

### b. New Mexico's Contacts with the State Exceed the contacts in *Antt*, *Wercinski*, *Bulkley* and even *Grewal*.

New Mexico purposefully directed its conduct at Texas. This case is unlike *Antt*, *Bulkley*, and *Wercinski* in three important ways (1) NMED's contacts with Texas were more extensive than simply sending a cease-and-desist letter (2) NMED established "known" contact with Texas instead of just "hypothetical" contact (3) the enforcement efforts were not cabined to New Mexico.

First, NMED did not merely send a cease-and-desist letter, it inspected the discharge site in El Paso and issued two Compliance Orders against EP Water, requiring it to

10

take actions within Texas state lines. Second, EP Water can point to contacts with NMED, in the form of inspections and the compliance order, that actually occurred and thus were not "hypothetical."

Third, NMED did not limit its inspections to the portions of New Mexico that suffered the effects of the sewage line breaks. Instead, it visited and inspected the discharge site in El Paso, Texas. Resp. 5, ECF No. 28. New Mexico concedes this. *See* Reply 2, ECF No. 33. ("The investigation . . . mostly consisted of reviewing publicly available documents, along with a single visit to view remediation efforts along the river, which was undertaken at the invitation of utility officials."). The initial communications between EP Water and New Mexico seemed somewhat cooperative and at that point, it is unlikely New Mexico would have foreseen being heralded into court in Texas. However, that quickly changed after it issued its compliance orders.

NMED's compliance orders were not "cabined" to tasks that can be performed in New Mexico or that solely affect New Mexico residents. For example, the orders direct EP Water to "limit public access to the work area in the Texas riverbed," to "conduct water quality monitoring and testing on a monthly basis at two locations in Texas and provide quarterly reports to New Mexico," and to engage in mitigation and restoration activities including "erosion control" and "re-planting of native vegetation" "on and adjacent to the Rio Grande," without specifying whether those areas are in Texas or New Mexico. Resp 6, ECF No. 28; *Administrative Compliance Order*, Exh. 1 ¶ 38, 39 40. In this way, New Mexico "projected [itself] across state lines." *Grewal*, 971 F.3d at 493.

Taking all of New Mexico's jurisdictional contacts together, New Mexico's contacts exceeded those in *Grewal* and were also more targeted at Texas specifically. *See*

11

*Grewal*, 971 F.3d at 495 (" . . . it is the defendant's contacts with the forum state, and not just the plaintiff, that must drive the personal jurisdiction analysis."). Thus, the Court finds that New Mexico had sufficient minimum contacts with Texas to subject it to personal jurisdiction in Texas.

### c. *Calder*'s effects test jurisdiction

In the alternative, EP Water argues that personal jurisdiction can be exercised in this case under the *Calder* effects test. Resp. 23–24, ECF No. 28. In *Grewal*, the Fifth Circuit found it dispositive that the defendant "knew that the cease-and-desist letter would 'have a potentially devastating impact' on the plaintiffs—and, by extension, those who wished to benefit from the plaintiffs' activities, including Texas residents." 971 F.3d at 495. There, the harm to Texans was the potential that Texans would not be able to benefit from a gun manufacturer's promotion of educational research about the printing of 3D firearms. *Grewal*, 971 F.3d at 488–89.

But the effects of the jurisdictional contacts and the harm to the forum state are even more interconnected here than in *Grewal*. The harm caused by a lack of advertising from a gun company is not only more attenuated, it also affects a more limited subset of the Texan population—those Texans who are interested in learning more about the 3D printing of firearms. By contrast, NMED's compliance orders will more directly affect a broader swath of the population: all El Paso residents.

"EP Water is a publicly owned water utility and the expenses necessary to pay a fine of more than $1.2M and comply with NMED's Orders would dip into public funds and would necessarily cause an increase in the water and sewer service rates of ratepayers (i.e. residents) of the City of El Paso." Resp. 7, ECF No. 28; *see* Affidavit of Arturo Duran, EP

12

Water CFO, Ex. 2 ¶ 1–3. Thus, El Pasoans will feel the aftermath of NMED's compliance orders in their household budgets and pocketbooks.

However, the Court does not rest its finding on *Calder*'s effects test jurisdiction. "[Effects] jurisdiction is rare," and appears to be limited to intentional tort cases. *Wercinski*, 513 F.3d at 485; *See* Lee Goldman, *From Calder to Walden and Beyond: The Proper Application of the "Effects Test" in Personal Jurisdiction Cases*, San Diego L. Rev. 357, 365 n.51 (2015) (" . . . Calder's three part test 'applies only to intentional torts' . . ."). EP Water's claims—Supremacy Clause and Dormant Commerce Clause violations—are constitutional in nature. Compl. ¶ ¶ 78-131, ECF No. 14. Because EP Water did not identify—and the Court did not find—case law supporting the application of effects jurisdiction in non-intentional tort cases the Court does not apply it here.

## IV. The Exercise of Personal Jurisdiction is Fair and Reasonable.

Although NMED does not address whether the Texas's exercise of personal jurisdiction is fair and reasonable, the Court discusses that prong of the analysis here as it relates to federalism concerns.

"Federalism and state sovereignty are an essential part of the constraints that due process imposes upon personal jurisdiction." 513 F.3d at 488. These constraints "ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *Id.* (citing *World-Wide Volkswagen*, 444 U.S. at 292). In this way, safeguards around personal jurisdiction, protect "the independence of the states." *Id.* Adhering to these federalist concerns, in *Wercinski* the court held that it was "unreasonable" to extend personal jurisdiction over the Arizona Commissioner. *Id.*

13

However, the Court distinguishes this case from *Wercinski* because that case involved an individual business entity attempting to assert personal jurisdiction over an out-of-state public agency. The instant case also involves an out-of-state agency (NMED) but where it differs from *Wercinski* is that the party moving for personal jurisdiction is also a state agency (EP Water). Thus, declining to extend personal jurisdiction would "allow a neighboring state to extraterritorially assert its state laws against a *political arm* of a neighboring state and then force that political subdivision to defend itself in a foreign forum. . ." Resp. 22, n.101, ECF No. 28 (emphasis added).

EP Water argues that the "federalism concerns raised by the panel in *Wercinski* work in reverse in this case." Resp. 22, n.101, ECF No. 28. The Court agrees that these federalism concerns support the argument that extending personal jurisdiction over NMED is fair and reasonable.

## CONCLUSION

The Court finds that NMED has purposefully directed its activities toward Texas through its enforcement actions, which include conducting a site visit in El Paso, Texas and issuing two Administrative Compliance orders which would require EP Water to perform activities in Texas.

Accordingly, **IT IS HEREBY ORDERED** that the New Mexico Environment Department's Motion to Dismiss for Lack of Personal Jurisdiction, ECF No. 18, is **DENIED**.

SIGNED this 18th day of **July 2023**.

THE HONORABLE DAVID BRIONES
SENIOR UNITED STATES DISTRICT JUDGE